UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| MARK D. MORIN,<br><br>      Petitioner<br><br>v.<br><br>JEFFREY MERRILL, WARDEN,<br>MAINE STATE PRISON,<br><br>      Respondent | Civil No. 06-122-B-W |

## **RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION**

Mark Morin has filed a 28 U.S.C. § 2254 petition containing five grounds challenging his State of Maine conviction for unlawful sexual contact with a child under fourteen. The State of Maine, on behalf of Jeffrey Merrill, the Warden of the Maine State Prison, has filed a motion to dismiss (Docket No. 3) to which Morin has not responded. I recommend that the Court grant the motion and deny Morin 28 U.S.C. § 2254 relief.

*Discussion*

*Summary of the Factual Dispute Concerning Morin's Conduct*

Morin has a Ph.D in psychology and is a clinical neuropsychologist who evaluates brain damage and a "regular psychologist" who treats people for depression and anxiety. In early 2002, a former high school classmate of Morin's, G. B., contacted Morin seeking counseling concerning difficulty she was having with her nine-year-old son and her own depression. Morin counseled the woman in the spring of 2002, and her son participated in some of these sessions. In April of 2002 the professional doctor/patient relationship

ended and the woman sought to continue her contact with Morin, hoping that something romantic might evolve. Morin explained to her that his allegiance to the professional rules of conduct prevented him from entering into a romantic relationship with a former client until two years after the end of professional consultations. However, during the spring and early summer of 2002 Morin and the woman did get together on a friendly basis for outings, barbecues, and the like, and at times her son would be included in these activities. With the woman working in the lab at the nearby hospital, she was required to do weekend night shifts where she was either at the hospital or on call. In early July it was arranged that her son would spend a Saturday night with Morin during one such call of duty. (Prior to this decision the boy would stay with local relatives during his mother's night shifts.) This arrangement became more regular and Morin became increasingly involved in the boy's life -- taking him swimming, helping him with his reading, and so forth. On Sundays G.B would come to Morin's residence and Morin, G.B., and the boy would go together to church, joined by Morin's mother.

      To resolve this 28 U.S.C. § 2254 petition it is not necessary to delve deeply into the factual disputes concerning what did and did not transpire between Morin and the nine–turned-ten-year-old son between July and November 2002. The prosecution's theory was that on several occasions while Morin was caring for the boy at his home and during a swimming outing, Morin intentionally engaged in inappropriate hand contact with the boy's penis and that he encouraged the boy to touch Morin's scrotum and penis. In defense, Morin allowed that he did have interactions with the boy concerning the boy's experience of erection and the cleaning of his uncircumcised penis, he did permit the boy to touch Morin's own genital area when the boy demonstrated a curiosity in Morin's

scrotum and erect penis, and he did at times pull down the boy's shorts as a sort of counter-demonstration after the boy persisted in doing so to him.  Morin claimed that he was approaching this area of behavior as a father figure in the boy's life, filling a void as the boy never knew his biological father, and all of this was with the, at least tacit, approval of the mother.   Morin believes that the charges against him only arose after, <u>and because</u>, he made it clear to G.B. in late November 2002 that there was no prospect of a romantic relationship between them.

### *Two Key Limitations of 28 U.S.C. § 2254 Review*

This court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court <u>only</u> on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a) (emphasis added).  Section 2254(b)(1)(A) requires that a § 2254 petitioner exhaust "the remedies available in the courts of the State" prior to applying for federal habeas relief.   With respect to this exhaustion requirement, the United States Supreme Court has explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the " ' "opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.' " <u>Duncan v. Henry</u>, 513 U.S. 364, 365 *(*per curiam*)* (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in <u>each appropriate state court (including a state supreme court with powers of discretionary review</u>), thereby alerting that court to the federal nature of the claim. <u>Duncan</u>, <u>supra</u>, at 365-366; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999).

<u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004) (emphasis added).

*Ground One: Prosecutor Led the Witness*

In his first 28 U.S.C. § 2254 ground Morin complains that the victim-child-witness was led by the prosecutor. He states that because the victim was a child the prosecution was afforded "wider latitude" apropos leading the witness. Morin claims that the prosecutor put words in the mouth of the victim and that this testimony was the only time that any criminal behavior was articulated. Morin relates that the prosecutor stated that the "memory" of the allegedly inappropriate contact was recalled only after the child spoke with the prosecutor, the investigator, and the victim advocate and that this memory was not recalled during the initial interview with police or other professionals. Morin faults his lawyer for not objecting to the leading questions. He believes that the prosecutor should be obliged to demonstrate that the child's memory was not unduly influenced by investigative techniques or "the demand characteristics of authority figures." Morin claims that the reason he did not exhaust his state remedies regarding this issue was because his attorney did not believe this was an appealable issue.

The state argues that this is a sub-constitutional state law evidentiary claim that is not cognizable under 28 U.S.C. § 2254(a).[1] The State is right; this court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the

---

[1] Hedging its bets, the State adds that, should the petition be construed as raising an ineffective assistance claim in this ground, such a claim has not been exhausted in the state courts and is now procedurally defaulted. In my view, Morin's complaint about counsel's performance on appeal is targeted at excusing any non-exhaustion/procedural default problem with this ground. Morin has not clarified the issue in that he failed to file a responsive pleading to the State's motion to dismiss. See Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006) ("Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced."). In any case, having read the trial transcript and considered the direct and re-direct examination of the boy by the prosecution (Trial Tr. at 2-36, 59-66), I am confident that Morin cannot meet his burden of establishing cause for his procedural default by relying upon an ineffective assistance claim against either trial or appellate counsel based on the failure to contemporaneously object to the questions or to raise the claim on direct appeal, see Bousley v. United States, 523 U.S. 614, 622 (1997); Ramirez-Burgos v. United States, 313 F.3d 23, 32 (1st Cir. 2002); Prou v. United States, 199 F.3d 37, 49 (1st Cir. 1999).

4

judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (emphasis added).

### *Ground Two: Prosecutor May Have Failed to Disclose Exculpatory Evidence*

In his second ground Morin complains that in the course of "a subsequent malpractice suit the 'victim' was evaluated by several people (social workers, psychologists, psychiatrists, etc)." In discovery Morin received a copy of a psychiatrist's November 2003 evaluation – one month before Morin's trial -- which contained findings that the victim denied having a history of sexual abuse. Morin's attorney sent a letter to the prosecutor dated April 19, 2006, and to Morin's knowledge there has been no response. Morin does concede that if this evaluation was done solely for purposes of the malpractice suit the District Attorney may have no knowledge of it. With regards to exhausting his state remedies, Morin explains that this information only recently came to light, after the post-conviction proceedings and the time to bring further appeals had expired.

The State asserts that this ground was not properly exhausted in the state courts because he did not alert the state courts to the federal constitutional nature of his claim. See generally Goodrich v. Hall, 448 F.3d 45, 47-48 (1st Cir. 2006). It argues that if Morin had raised this claim in the state post-conviction proceedings he would have learned -- as post-conviction counsel did in May 2006 --that the State was never in possession of this November 2003 psychiatric evaluation of the victim.

While the State offers no record citation to substantiate the claim that post-conviction counsel discovered that the State never received this evidence (and therefore

5

had nothing to turn over to the defense), Morin's failure to respond to the State's argument leaves his concession that the State may not have had the report and the State's representation concerning post-conviction counsel receipt of this information untested. As the petitioner, it is Morin's obligation to generate sufficient factual fodder both vis-à-vis his underlying Brady v. Maryland, 373 U.S. 83 (1963) claim and his argument that his non-exhaustion/procedural default of this claim should be excused, see Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006) ("Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced."); see also Broom v. Mitchell, 441 F.3d 392 (6th Cir. 2006)(discussing a 28 U.S.C. § 2254 petitioner's burden apropos a similarly postured Brady claim).

### *Ground Three-Morin Was Not Allowed to Fully Confront His Accuser*

In his third 28 U.S.C. § 2254 ground Morin states that he has 500 pages of e-mails documenting the history of his relationship with the alleged victim and his mother. "Taken as a whole," Morin believes, "the e-mails document the mother's unrealistic expectation of marrying a doctor, living 'happily ever after,' and extreme anger after being 'rejected.'" Morin contends that collectively these missives depict a woman who has motive to elicit false memories from her son. According to Morin, the trial judge indicated that they did not have time to go through all the e-mails and limited the defense to identifying a half a dozen or so of these messages that the defense wanted to use.[2] With regards to the exhaustion of this ground Morin relates that he discussed this ground

---

[2] A read of the trial transcript reveals that the trial judge did not expressly limit the number of e-mails that could be admitted; he instructed the two attorneys to confer and cull out a reasonable number of probative e-mails sufficient to get the defense's point across while avoiding dragging the trial out while each of the 500 individual e-mails was proffered for admission.

6

with his lawyer during preparation of the direct appeal but the lawyer did not include it in the final draft. Morin states that he did plead this ground in his post-conviction but did not include it in the pleading seeking discretionary review of the denial of post-conviction relief because his attorney and Morin wanted the court to focus on what they thought was their strongest argument and at the time of the post-conviction hearing the judge and District Attorney misunderstood the nature of his argument, thinking that Morin was commenting on the fact that two e-mails were not admitted because their provenance could not be ascertained.

The State argues that this ground was not properly exhausted in the state courts because Morin did not alert the state courts to the federal constitutional nature of his claim vis-à-vis the exclusion of e-mails. The State concedes that Morin did raise the exclusion of e-mail at trial and on appeal as an evidentiary concern. However, it contends that Morin only identified the <u>federal</u> constitutional concern in his motion for a new trial; with regards to his direct appeal Morin only referenced the state evidentiary aspect of the claim.

In his motion for a new trial Morin argued that his constitutional right to a fair trial was infringed when, among other things, the trial court limited his use of the e-mails. (Mot. New Trial at 1.) In the memorandum accompanying that motion counsel argued that the shear volume of the e-mails over the eighth month period "was important and substantial evidence improperly excluded by the trial court." (Mot. New Trial Mem. at 6.) "Had the defendant been allowed to proceed with the impeachment of the complainant's mother," Morin argued, "it would have allowed the full force of the email evidence and may have affected the verdict obtained." (<u>Id.</u>) Morin described the evidence as

7

demonstrating that the mother of the boy wanted to hurt him and this was motive for fabricating the facts. (Id. at 6-7.) However, when he took his direct appeal, the aspect of the Rule 33 motion for a new trial that he chose to appeal related to an alleged Rule 16 discovery violation.

In the memorandum on direct appeal to the Maine Law Court, however, regarding the exclusion of e-mails Morin asserted that the trial court erred "by excluding two e-mails that would have impeached the prosecution's case and supported the defense." (Appellant Mem. Br. at i) (emphasis added). In fleshing out this ground for the Maine Law Court's consideration counsel identified two specific e-mails that the defense had attempted to introduce at trial as, one, non-hearsay, prior inconsistent statements and, two, hearsay-excepted, substantive evidence of the sender's favorable state of mind towards Morin. (Id. at 29; see also Trial Tr. at 220-23.) In his appeal brief counsel cited to rules of evidence and argued evidentiary standards, citing a treatise and precedents discussing what circumstantial evidence is sufficient to authenticate exhibits. (Appellant Mem. Br. at 30-32.) This argument to the Maine Law Court does not meet the standard for adequate presentation of the constitutional nature of the claim. See Reese, 541 U.S. at 29; Goodrich, 448 F.3d at 47-48. Furthermore, Morin is clearly seeking this court's review of the purported exclusion of, not just these two e-mails that were brought to the Maine Law Court's attention, but of an adequate sample of the 500 e-mails defense had on hand on the theory argued to the trial court in the motion for a new trial. Accordingly, the e-mail exclusion argument made here has a discreet factual basis and a different defense theory than the argument made to the Maine Law Court in the direct appeal. See Harding v. Sternes, 380 F.3d 1034, 1046-48 (7th Cir. 2004).

### *Ground Four – His Attorney Negligently Did Not Call an Appropriate Expert*

With regards to the defense's use of expert witnesses, at trial Morin's attorney was prepared to call a sex-education specialist as an expert witness who would testify regarding childhood development; puberty; hormonal, chemically induced erections in the developing male; the normal stages of human development; non-sexual erections upon waking caused by the accumulation of urine in the bladder; and appropriate ways to clean an uncircumcised penis.   Although the prosecution had advance notice of the defense plan to call this witness, the trial court sustained a trial-day objection and her testimony was excluded.

In his fourth 28 U.S.C. § 2254 ground Morin does not focus on counsel's performance apropos this expert; instead he complains that his attorney should have called a different, more appropriate expert witness.  He states that the State was relying on the memory of a young boy who did not remember any molestation until months after the boy's mother accused Morin of the inappropriate contact.  In an e-mail the mother told Morin that she could not envision a relationship without sex and because Morin did not want to have sexual relations with her she assumed that Morin must have wanted such relations from her son.  Morin considers it specious that the specific details of the molestation came out only after interviews with the District Attorney, an investigator, and the victim advocate.  Morin believes that there are experts that could have testified as to the malleability of the child's memory and the tendency of children to "remember" so as to please authority figures.  Morin faults his attorney for making no effort to find such an expert to testify.

With regards to the 28 U.S.C. § 2254(b)(1)(A) exhaustion of this ground, Morin represents that his attorney elected not to include this in the direct appeal and told Morin that it was not appealable (which I gather was meant to convey that ineffective assistance claims are properly aired in post-conviction assistance proceedings). He states that he did include it in his post-conviction petition and in his pleading seeking discretionary review of the Maine Law Court. The State concedes that this Sixth Amendment claim is properly exhausted.

Morin must establish that his attorney's performance was ineffective under the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). Accordingly, he "must establish that (1) 'counsel's representation fell below an objective standard of reasonableness,' and (2) 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Smiley v. Maloney, 422 F.3d 17, 20 (1st Cir. 2005) (quoting Strickland v. Washington, 466 U.S. 668, 694 (1984) and citing Mello v. DiPaulo, 295 F.3d 137, 142 (1st Cir. 2002)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

As a 28 U.S.C. § 2254 petitioner, Morin must demonstrate,

> that the state court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Id. § 2254(d)(1). The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," Williams v. Taylor, 529 U.S. 362, 405 (2000), or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result," id. at 406. The "unreasonable application" prong is satisfied if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Moreover, "a

> federal habeas court may not issue the writ simply because that court
> concludes in its independent judgment that the relevant state-court
> decision applied clearly established federal law erroneously or incorrectly.
> Rather, that application must also be unreasonable." Id. at 411.

Id. The First Circuit has repeatedly, "noted that '[t]he Strickland principles for deciding ineffective assistance of counsel claims are 'clearly established' for purposes of the AEDPA.'" Id. at 21 (quoting Ouber v. Guarino, 293 F.3d 19, 26 (1st Cir.2002) citing Williams, 529 U.S. at 371-74)).

In this forum Morin continues to maintain that his counsel should have drawn on Morin's own expertise in the field of psychology and sought a different expert who could testify on the memory of a young boy and how that might be impacted by pressure from an authority figure.

This issue was joined in the post-conviction proceedings.[3] At the post-conviction hearing Morin testified that he thought there were several possibilities for expert witnesses beyond the particular expert counsel settled on. (Post-Conviction Tr. at 6.) He relayed that there are individuals that he could have suggested to counsel, specifically naming two individuals "with extensive training in memory and neuropsychology and psychiatry and medicine." (Id. at 7-8.) Morin complained that his input was never solicited and he was not "particularly sure it was wanted." (Id. at 8.) Morin claimed to have prodded his attorney to pursue this avenue and that he would not only have been able to suggest names but, as he was at liberty awaiting trial, he could have made the necessary contact. (Id. at 9.) He speculated that there were "probably lots of more people more qualified [than the expert cultivated by defense counsel] … who would have

---

[3] Post-conviction counsel sent the Superior Court a letter following the issuance of the post-conviction assignment order expressly iterating that Morin wished the court to include this claim in the proceedings.

11

[met] the more conventional definition of an expert." (Id. at 16.) He asserted that he had placed $10,000 in escrow to be used for expert fees and that very little of that was used for the trial. (Id.)

Asked what expert testimony Morin, as a specialist in the field, would have had counsel elicit from an alternative expert, Morin explained:

> Well, the underlying question is how – how could a child be talking about an event that didn't happen in a way that he is convinced that it did, in fact happen. And in psychology the term for that is confabulation. It's not lying because the person believes that it's true. What it is is filling in holes in your memory and your knowledge with things that make sense, things that have – you've been taught by people in authority. And so as a result false memories get created. A child has an overwhelming desire to please those in authority, particularly his or her parent, and that's a factor that goes into what a child is going to say and eventually comes to believe is true.
> ….
> In my case, I made it clear to [the boy's mother] that a romantic and/or sexual relationship was not going to happen. She became very upset. Approximately a month later, I was accused of molesting her son. I told her that didn't happen. Nothing – nothing further was done with that for several months, at which point she brought the child to a professional knowing that the professional would have to take action on that. My question is what happened in those several months. If this was a question, an issue that she had, why wasn't it addressed right away, what happened in those months that would have brought this off from the child.
> After that, when the allegations were brought forward in an official manner, several months after they were brought forward to me, the specific allegations the boy brought forward for trial was never articulated. It wasn't mentioned in the social worker's report, wasn't mentioned in the doctor's report. It wasn't mention in his evaluation at Spurwink. And my question is if this, in fact, was something that really happened, why didn't the boy tell any of these number of professionals that he could have told.
> ….
> … An expert would have told the mechanism by which the boy would have come to believe that this was, in fact, something true. It's not something that would have happened overnight and it took time for it to happen which, in fact, nine to ten months over the course of the trial – over the course of preparing for trial something happened that the boy came to believe something is true that wasn't true.

12

(Id. at 17-19.) Morin represented to the post-conviction court that his attorney was not receptive to his suggestions on this score, not thinking that this domain was something important. (Id. at 19-20.)

On cross examination Morin conceded that he never gave the names of alternative experts to his trial attorney because his attorney did not ask him about this, his feedback was never solicited, and Morin did not consider it his job to suggest them unsolicited. (Id. at 33-34.) He indicated that he was never informed as to whether or not his attorney talked to any other experts prior to trial but that it would not have surprised Morin if his attorney had. (Id. at 44.) His post-conviction attorney explained to the court that Morin was arguing that an expert with better or more thorough qualifications could have been found and that Morin was actually acquainted with national experts in this area of memory that had a better chance of meeting the rigorous qualification standards to testify. (Id. at 61-62.) The judge responded: "I mean, you've got the best expert in the world, it's not going to be admissible in Maine." (Id. at 62.)[4]

Morin's trial attorney testified during the post-conviction hearing about his representation of Morin in preparation for and during trial. Counsel explained that, "the theory of the case was … that the conduct that [Morin] did engage in, he did as a friend, he did it as a mentor, he did it as a father figure, and … the conduct that he did engage in was not for the purpose of sexual gratification. " (Id. at 71.) With regard to the question of finding an appropriate expert witness, Morin's trial attorney explained, that, as Morin had indicated that he had been involved in a nudist colony, he explored getting someone from a nudist colony to testify as to how a nudist might regard this kind of conduct but he

---

[4]    It appears to me that the judge's comment was likely tethered to a line of cases under Maine law beginning with State v. Black, 537 A.2d 1156 (Me. 1988) and State v. Gordius, 544 A.2d 309 (Me. 1988) that have suggested the sort of expert Morin envisioned might well be excluded.

13

was rebuffed because the people he spoke with did not want to "get involved in such a case where that type of conduct took place." (Id. at 76.) Counsel also met with Dr. Ricci – who ultimately was present at trial as a rebuttal witness for the prosecution – because he respected Ricci after their co-participation in other cases – usually on opposite sides-- and Ricci had done a preliminary evaluation of the boy and was familiar with the discovery. (Id. at 76-77.) Counsel was hoping that Ricci "could shed some light in terms of some favorable testimony" that would support Morin's explanation for his conduct. (Id. at 77.) He was also hoping that Ricci "could see through the boy's statement and see that the mother was behind it and pushing the boy to make these types of statements." (Id.) Ricci told counsel "flat out, that he couldn't be of assistance in this type of case" -- along those lines -- in light of Morin's behavior and given what Ricci knew. (Id. at 77-78.) This is why counsel turned his attention from trying to justify Morin's behavior towards fleshing out the boy's behavior as the normal outgrowth of innocent physical development. (Id. at 78.)

Asked by Morin's post-conviction counsel if it ever occurred to trial counsel to pick Morin's brain regarding an appropriate expert, trial counsel responded that he took Morin's case extremely seriously because he recognized the high stakes for Morin, as a professional psychologist, that these charges generated. (Id. at 79, 97.) He indicated: "I believe that I utilized his expertise and I believe that the conversations we had that he should have always felt welcome to give me any help that he felt that he could have given me." (Id. at 79-80.) With regard's to Morin's testimony at the post-conviction hearing that he knew of two national experts that could have been potential expert witness trial counsel opined:

14

> I think he testified that he didn't mention them at my office and I would have to say the same. I mean, we might have talked about theories that if we had followed through with them and thought that they were valid strategies that we would have followed through. But like I say, after talking with Dr. Ricci and after doing my own independent research in trying to understand the case, I thought it was a case of credibility, and I thought the e-mails and what his testimony was and the testimony of our expert[] …

(Id. at 81.)  On redirect, trial counsel further explained:

> I-I first met with Dr. Ricci to discuss the contents of the reports from the Spurwink Clinic, and at the same time hoping that he could see my client's position and validate that position, but I could see that I wasn't going – I wasn't making any leeway with him there, and the way he explained things to me in terms of the behavior, all of it being consistent with grooming technique that I couldn't – I couldn't justifiably put more time into that – pursuing that strategy.
>     I didn't see it as being a memory issue.  I first saw it as being is there – is there any professional – professional opinion out there that would validate my client's conduct and, if not, then I'd turn my attention to a sex education teacher that would explain why these – how these circumstances could arise that my client found himself in.  And that the circumstances, the situation, could arise all from innocent – innocent, physical growth of the boy, and hope that the jury would believe that.  The way [Morin] had explained things and seeing him on the stand and hearing about [the mother] and how she wanted to trap him into marriage, I was hoping that at the end the jury would see that he was acting as a father; and to me, with all due respect to the Trial Court, to me, that [the exclusion of the defense expert on hand for the trial was] where the error lied.  And, first of all, entertaining an objection so late as to my expert testifying and then agreeing with the State, that, but we appealed that to the Law Court.  They agreed with the Trial Court, so here we sit.

(Id. at 100-01.)

With respect to this ineffective assistance claim, the post-conviction court opined:

> This court finds that the petitioner failed to prove either of the two-prongs necessary to sustain his burden of proving ineffective assistance of counsel.
>     One of the allegations against the trial attorney is that he should have called an expert on the issue of memory and childhood development. Although the petitioner, a clinical psychologist himself, named two possible witnesses in the area of childhood memory, he never made these recommendations to his attorney although he met with him on a frequent

15

> basis. The petitioner offered no legal authority to the effect that such evidence would be admissible in this particular case. The ten-year-old victim testified to several contacts with the petitioner and his testimony was corroborated by some photographs and the testimony of other witnesses. During the trial, the petitioner admitted to some of the contacts, but argued that they were not of a sexual nature. Furthermore, Maine law restricts the introduction of expert testimony regarding the memory of a ten-year-old boy. The same is true as regard to expert testimony as to childhood development. It would not have aided the petitioner with regard to his defense in this case.

(Post-conviction Dec. at 2.)

In his memorandum seeking the Maine Law Court's review of the denial of post-conviction relief, Morin targeted solely this issue: "Did the court below commit reversible error in declining to consider petitioner's claim that trial counsel for the defendant failed to adequately explore the possibility of expert testimony." (Mem. Certificate Probable Cause at 2.) Denying the certificate of probable cause to appeal this determination the Maine Law Court's order rejecting the request stated:

> We have reviewed the judgment entered in the Superior Court, and have fully considered the petition and its request for a certificate of probable cause. The petitioner contends that the Superior Court erred or exceeded its discretion in concluding that trial counsel was not ineffective in failing to call an expert witness to testify about the development and memory of ten-year-old-boys for purpose of attacking the child victim's credibility.
> Based on our review, we determine that no further hearing or action is necessary to a fair disposition of this matter.

(Order Denying Certificate Probable Cause at 1.)

First, I note that the factual findings pertaining to trial counsel's performance made by the Superior Court after the evidentiary post-conviction hearing are presumed correct. 28 U.S.C. § 2254(e)(1). Morin has "the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. I further note that Morin, relying on a conclusory assertion that an expert in memory could have been useful to the defense,

16

never presented the state court with a more than purely subjective factual basis - such as third-party scientific materials in this area of psychology[5] – upon which it could have found that the proposed expert testimony would have aided the defense. Thus, Morin, who has not even attempted to describe the fundamentals of this area of expertise to this court in his pleadings, is not entitled to an evidentiary hearing in view of § 2254(e)(2).[6] This failure seriously limits the court's ability to perceive, through the Strickland lens, either a deficiency of performance on counsel's part, see, e.g., Bugh v. Mitchell, 329 F.3d 496, 514 (6th Cir. 2003) or prejudice, see, e.g., Barkell v. Crouse, 468 F.3d 684, 698-99 (10th Cir. 2006).[7]

Second, as set forth above, trial counsel gave a very thoughtful and credible explanation as to how he dealt with the question of identifying an appropriate expert witness to meet the troubling charges faced by his client in view of his client's own admitted conduct. One example of the challenge he faced vis-à-vis experts was the knowledge that some of the prospective witnesses he did approach could only proffer testimony that would be detrimental to his client's defense. Bugh, 329 F.3d at 514 & n.5. Even if I did not owe such great deference to the state court's adjudication of this claim, ala 28 U.S.C. § 2254(d), I would be hard pressed to conclude that counsel demonstrated any measurable negligence or fallibility in arriving at and executing his trial strategy, much less a deficiency of performance violative of the Sixth Amendment.

---

[5] I recognize that Morin's testimony in the post-conviction proceeding contained a reference to "confabulation" and speculation that an expert could find that the mother was sowing the seeds of false memories in her son as a revenge tactic after Morin laid down the gauntlet. However, Morin did nothing in the post-conviction proceeding or in his 28 U.S.C. § 2254 filings to move beyond this conjecture and present tangible evidence that an expert in this alleged specialty would have been allowed to testify as to this particular witness.

[6] He is not relying on a new rule of constitutional law and his own version of events is that he was aware during his preparation for trial that these experts might be available. See § 2254(e)(2)(A).

[7] This is a shortcoming that particularly hinders any meaningful analysis of the prejudice prong of the ineffective assistance standard.

### *Fifth Ground- Expert Testimony Was Not Allowed at Trial*

In his fifth and final 28 U.S.C. § 2254 ground Morin laments that the expert testimony that was disclosed by the defense was not allowed at trial. He explains that prior to the trial his attorney wrote to the prosecutor identifying all the witnesses and a meeting was held to discuss witnesses. No objection was lodged apropos the defense witnesses. At the "last minute" the prosecutor objected to Morin's expert witness relating to whether or not the witness would give an opinion as to guilt or innocence. Morin claimed this objection imposed an undue hardship on the defense.

As for exhaustion, Morin states that he did raise this ground on direct appeal and, accordingly, it was unnecessary to raise it in his state post-conviction petition. It is clear from the record that this claim was raised and decided against Morin in his direct appeal and is thus fully exhausted. The State does not claim otherwise.

The state argues that this is a sub-constitutional state law evidentiary claim that is not cognizable under 28 U.S.C. § 2254(a). With regards to his pursuit of this claim <u>in this court</u> Morin has not attempted to drape this ground in a constitutional cloak.[8] As with Morin's first ground – the exhaustion concern aside -- this court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the

---

[8] Morin's appeal brief to the Maine Supreme Court does argue at one juncture that the exclusion of the evidence "deprived Mr. Morin of his federally protected constitutional due process right to a fair trial." (Br. Appellant at 24.) In that brief Morin did not cite a Supreme Court precedent in support of this argument, and this failure may or may not have imperiled his chance of obtaining 28 U.S.C. § 2254 review, see Reese, 541 U.S. at 29 (discussing adequate presentation of a constitutional claim to the state court for purposes of preserving the right to 28 U.S.C. § 2254 review); Goodrich, 448 F.3d at 47-48 (same), and the Maine Law Court did not cite any such precedent. It seems that the appropriate starting point for a constitutional analysis of this decision to exclude would be Crane v. Kentucky, 476 U.S. 683, 689-92 (1986). It appears to me that -- even if Morin did properly frame a constitutional challenge in his 28 U.S.C. § 2254 petition (or even clarified that was his intent by replying to the State's argument that this was a sub-constitutional claim, which he did not) -- the Maine Law Court's affirmance of the trial court ruling would survive scrutiny under the "contrary to" prong of 28 U.S.C. § 2254(d)(1). See Knight v. Spencer, 447 F.3d 6, 11-12 (1st Cir. 2006); see also Early v. Packer, 537 U.S. 3, 8 (2002) (observing that it is not necessary for a state court to cite or be aware of Supreme Court precedents so long as "neither the reasoning nor the result of the state-court decision contradicts them").

judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (emphasis added).

### *Conclusion*

For the reasons set forth above, I recommend that the Court **GRANT** the motion to dismiss (Docket No. 3) and **DENY** Morin 28 U.S.C. § 2254 relief.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

January 22, 2007.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge